UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                           :

OLIVE GROUP FZ-LLC,                      :

                   Plaintiff,        :

           -v-                   :        25 Misc. 318 (JPC)

                           :

AFGHANISTAN CIVIL AVIATION AUTHORITY,  :       OPINION AND ORDER

                           :

                Defendant.      :

                           :
-------------------------------------------------------------------X
                           :

BRITISH AIRWAYS PLC,                :

                           :

               Movant.        :

                           :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Non-party British Airways PLC moves for a protective order prohibiting Olive Group FZ-LLC from seeking discovery of information about its business operations related to the Afghanistan Civil Aviation Authority (the "ACAA").  Olive Group received a judgment against the ACAA in the United States District Court for the District of Columbia after prevailing in arbitration and securing enforcement of that arbitral award.  For the reasons that follow, the Court concludes that it lacks personal jurisdiction over British Airways in this matter and thus grants the motion for a protective order.

## I. Background[1]

Olive Group, a limited liability company based in the United Arab Emirates, provides private security services specializing in airport and aviation security.  Dkt. 10 ("Battista Decl."), Exh. 4 ("Petition") ¶ 2.  On August 4, 2018, Olive Group contracted with the ACAA to provide security at four international airports in Afghanistan.  *Id.* ¶ 8. On April 12, 2021, following various alleged breaches of that contract, Olive Group served the ACAA with a Notice of Arbitration pursuant to the contract's arbitration provisions.  *Id.* ¶¶ 8-10.

On November 28, 2023, an arbitrator rendered a final award in favor of Olive Group, ordering the ACAA to pay a total of $15,286,002.30, plus interest.  *Id.* ¶¶ 44-48.  Olive Group then petitioned the United States District Court for the District of Columbia for recognition and enforcement of that judgment.  *See Olive Group FZ-LLC v. Afghanistan Civil Aviation Auth.*, No. 24-cv-02170-SLS (D.D.C.), Dkt. 1.  On July 25, 2025, the Honorable Sparkle L. Sooknanan entered judgment for Olive Group in the amount of $15,286,002.30, with post-award interest at a rate of 3% accruing from December 28, 2023, thereby confirming the arbitrator's final award.  *Id.*, Dkt. 27.

Olive Group initiated this action on July 29, 2025, seeking to register Judge Sooknanan's judgment in this District.  Dkt. 2; *see* 28 U.S.C. § 1963 (providing that registered judgments "shall have the same effect as a judgment of the district court of the district where registered and may be

---

[1] The following facts are drawn from the parties' submissions and construed in the light most favorable to Olive Group.  *Cf. Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (explaining that courts resolving a motion to dismiss for lack of personal jurisdiction "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor" (internal quotation marks omitted)); *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 307 (S.D.N.Y. 2015) ("Because a motion to dismiss for lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . [,] all pertinent documentation submitted by the parties may be considered in deciding the motion." (internal quotation marks omitted)).

enforced in like manner"). This Court issued an abstract of the judgment on August 25, 2025. Docket Entry, Aug. 25, 2025.

In fall 2025, Olive Group sent British Airways an Information Subpoena and Restraining Notice in connection with this action. Battista Decl., Exh. 1 ("Subpoena") (dated October 20, 2025); *see* Battista Decl. ¶ 5 (stating that British Airways received the Subpoena on November 20, 2025). The Subpoena informed British Airways that it was "forbidden to make or suffer any sale, transfer, or assignment of, or interference with, any property in which [the ACAA has] an interest," Subpoena at 2-3, and further demanded responses to a series of interrogatories which inquired, *inter alia*, whether British Airways was indebted to the ACAA, whether it held any of the ACAA's assets, and whether it had any accounts payable to the ACAA, *id.* at 4-5.

British Airways responded to Olive Group on December 12, 2025, claiming that the Subpoena "conflicts with United States and international laws." Battista Decl., Exh. 2 ("Response") at 1. British Airways explained that its only financial connection to the ACAA is in the form of overflight fees,[2] yet collection of such fees is a "sovereign function" under the Foreign Sovereign Immunities Act ("FSIA"). *Id.* at 2; *see* 28 U.S.C. § 1609 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."). British Airways

---

[2] Overflight fees are used to cover the cost of air traffic control and other operational services and "are assessed by governments around the world." *Thai Lao Lignite (Thailand) Co. v. Government of Lao People's Democratic Republic*, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 1703873 at *1 (S.D.N.Y. Apr. 19, 2013); *see also* 49 U.S.C. § 45301(a)(1) (directing the Administrator of the Federal Aviation Administration to establish a fee schedule for "[a]ir traffic control and related services provided to aircraft other than military and civilian aircraft of the United States Government or of a foreign government that neither take off from, nor land in, the United States").

therefore objected to the Subpoena, contending "to the extent that British Airways may be in possession of funds for which [the ACAA is] the ultimate beneficiary, such funds would be outside the attachment power of this Court." Response at 1, 5.

Olive Group replied to British Airways on December 22, 2025, asserting that British Airways' "blanket refusal to provide any factual information in response to the Subpoena is inconsistent with controlling Second Circuit and Supreme Court precedent." Battista Decl., Exh. 3 at 2. Among other arguments, Olive Group maintained that the FSIA does not "immunize[] a foreign-sovereign judgment debtor from post judgment discovery of information concerning its extraterritorial assets." *Id.* Olive Group also offered "to stipulate to entry of a protective order limiting use of [British Airways'] responses to enforcement efforts connected to Petitioner's Judgment and confidentiality of commercially sensitive information." *Id.* at 5.

British Airways then filed the instant motion for a protective order on January 29, 2026. Dkts. 9-10, 11 ("Motion"). Olive Group opposed British Airways' motion on February 13, 2026, Dkt. 18 ("Opposition"), and British Airways filed its reply on February 20, 2026, Dkt. 19 ("Reply"). In addition to invoking FSIA immunity, British Airways argues that it is beyond this Court's personal jurisdiction under New York's long-arm statute. Because the Court agrees that personal jurisdiction over British Airways is lacking, it does not reach the question of FSIA immunity.

## II. Personal Jurisdiction

British Airways argues that a protective order should be entered because "the information that Olive Group is seeking would be outside the general or specific jurisdiction of this court." Motion at 5. Olive Group counters that this Court has specific jurisdiction "rooted in British

Airways' New York business and the direct relationship between that business and the discovery at issue." Opposition at 13. The Court agrees with British Airways.

## A.    New York's Long-Arm Statute

"A district court . . . must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 45." *Gucci Am., Inc. v. Weixing Li ("Gucci I")*, 768 F.3d 122, 141 (2d Cir. 2014). The "specific-jurisdiction[3] analysis proceeds in two steps." *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A. Institución de Banca Múltiple*, 92 F.4th 450, 456 (2d Cir. 2024); *accord Licci ex rel Licci v. Lebanese Canadian Bank, SAL ("Licci I")*, 732 F.3d 161, 168 (2d Cir. 2013). First, there must be a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). In evaluating this requirement, federal courts look "to the long-arm statute of the forum state, in this instance, New York." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). If personal jurisdiction does lie under the applicable state law, courts then assess whether exercising personal jurisdiction "comports with due process protections established under the United States Constitution." *Licci I*, 732 F.3d at 168. Because Olive Group argues that personal jurisdiction lies "[u]nder New York's long-arm statute," Opposition at 7, the Court first considers whether New York law provides for such exercise.

New York's long-arm statute recognizes personal jurisdiction over a non-domiciliary who "transacts any business within the state," but only if the "cause of action aris[es] from" the acts

---

[3] Olive Group disclaims any theory of "general, 'all-purpose' jurisdiction" over British Airways, Opposition at 13, so the Court need not address that potential basis for personal jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (explaining that the proper inquiry for general jurisdiction for a corporate entity is whether its contacts with the forum state "are so continuous and systematic as to render it essentially at home in the forum State" (citation modified)).

that are the basis for jurisdiction.  N.Y. C.P.L.R. § 302(a)(1); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) ("To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." (internal citation omitted)).  "Courts look to the totality of the defendant's activities within the forum to determine whether a defendant has transacted business in such a way that it constitutes purposeful activity satisfying the first part of the test."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation modified).

"As for the second part of the test, a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  *Id.* (citation modified).  The New York Court of Appeals has "consistently held that causation is not required, and that the inquiry under the statute is relatively permissive."  *Licci v. Lebanese Canadian Bank ("Licci II")*, 984 N.E.2d 893, 900 (N.Y. 2012).  "In effect, the 'arise-from' prong limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction."  *Id.* at 900-01.  "Application of the second prong of the jurisdictional inquiry varies according to the nature and elements of the particular causes of action pleaded."  *Id.* at 901.  In the context of "nonparty discovery requests," the arise-from inquiry "focus[es] on the connection between the nonparty's contacts with the forum and the discovery order at issue."  *Gucci I*, 768 F.3d at 141.

## B.    Analysis

Olive Group argues that this Court has specific personal jurisdiction over British Airways, such that it may ultimately compel British Airways' compliance with the subpoena, because of the company's U.S. and New York contacts, including "hold[ing] a foreign air carrier permit from the

6

U.S. Department of Transportation," "operat[ing] flights to and from New York's John F. Kennedy International Airport," and "maintain[ing] a registered agent for service of process in New York." Opposition at 3. It also points to payments by British Airways that "move through correspondent banks and clearinghouse mechanisms that connect to New York financial institutions." *Id.* at 4. According to Olive Group, these contacts show that British Airways transacts business in New York for purposes of the first prong of the Section 302(a)(1) analysis. *Id.* at 7-8. British Airways' motion, however, focuses on the arise-from prong. British Airways argues that "any [British Airways] operations involving or transiting Afghanistan would . . . have no nexus to New York." Motion at 6. So the Court begins, and ultimately ends, with whether "there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines*, 490 F.3d at 246 (internal quotation marks omitted).

With respect to that second prong of the long-arm analysis, Olive Group argues that an articulable nexus exists because "British Airways cannot maintain its U.S. operations—including its New York flights—without maintaining payment systems for international aviation fees." Opposition at 12. In other words, "[w]hen British Airways pays aviation fees to foreign governments—including, potentially, [the] ACAA—those payments are processed through international wire transfer systems, which necessarily connect to New York financial institutions." *Id.* at 10. So, according to Olive Group, "[d]iscovery about [British Airways' payment systems] is directly related to British Airways' decision to conduct business in New York." *Id*. at 12.

The Court is not persuaded by this argument. While "relatively permissive," the arise-from inquiry still requires that the claim be "in some way arguably connected to the transaction." *Licci II*, 984 N.E.2d at 900-01. British Airways' decision to fulfill its obligations to pay overflight fees to Afghanistan does not in any meaningful sense arise from its operations in New York. For one,

7

British Airways "does not operate any flights from the United States," let alone from New York, "that pass through Afghanistan's airspace," and "the mere operation of [other] flights to and from New York alone cannot sustain specific jurisdiction where the entirety of the conduct at issue took place elsewhere." *Olive Group FZ-LLC v. Afghanistan Civil Aviation Auth.*, No. 25 Misc. 4105 (OEM) (CHK), 2026 WL 1381463, at *4 (E.D.N.Y. May 7, 2026) (rejecting Olive Group's theory of an articulable nexus as applied to another international air carrier). For another, the contention that "as an international company, [British Airways'] financial transactions must inevitably flow through New York" is "too attenuated to create an articulable nexus," as "Olive Group does [not] even . . . identify a New York bank account, let alone demonstrate that [British Airways] purposefully availed itself of a New York account to pay overflight fees in Afghanistan." *Id.* Indeed, Olive Group's position "proves too much; accepting it would allow specific jurisdiction over nearly every international entity that transacts any business in New York, thus rendering the second prong of the long-arm statute essentially meaningless." *Id.* British Airways' relationship to the discovery sought, as articulated by Olive Group, thus is too attenuated to satisfy the arise-from requirement. *See Sole Resort,* 450 F.3d at 104 (collecting cases dismissed under the second prong where "the injuries sustained and the resulting disputes bore such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having 'arisen from' the New York activity").

Olive Group's argument that British Airways has a "significant New York footprint" and that "the information sought is integral to enforcing a New York-registered judgment," Opposition at 12, falls short for similar reasons. The question is not whether British Airways operates in a state where Olive Group's judgment has recently been registered, but rather whether the information sought in the Subpoena arises from British Airways' New York activity. *See Gucci*

*I*, 768 F.3d at 141-42.  As just discussed, it does not.  And if Section 302(a)(1)'s nexus requirement could be circumvented merely by registering a judgment in a jurisdiction where the subpoena target maintains business operations, that statutory showing would be rendered toothless.

Olive Group further relies on the New York Court of Appeals' finding of personal jurisdiction in *Licci II*, arguing that "British Airways has far more substantial and direct New York contacts" than were present in that case.  Opposition at 11.  But the extent of British Airways' New York contacts is relevant only to the first prong of New York's long-arm statute, which does not appear to be in dispute.  *Licci II* is inapposite, however, for the arise-from analysis that must be conducted here.  In *Licci II*, "the complaint allege[d] that [the defendant] engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars."  *Licci II*, 984 N.E.2d at 901.  Olive Group does not proffer an analogous connection between British Airways' activity in New York and its payments to the ACAA.  *See Olive Group*, 2026 WL 1381463, at *3-4 (rejecting Olive Group's reliance on *Licci II* as "unpersuasive").  Instead, Olive Group baldly declares that "[British Airways'] payment processes necessarily implicate British Airways' New York banking relationships, its U.S. regulatory status as a foreign air carrier, and its integration into the U.S. financial system."  Opposition at 12.  Such conclusory assertions fall short of satisfying the arise-from prong and certainly are far afield from *Licci II*, where the "plaintiffs allege[d] that [the defendant] deliberately used a New York account again and again to effect its support of . . . shared terrorist goals," *Licci II*, 984 N.E.2d at 901.

Olive Group's reliance on *Gucci America, Inc. v. Weixing Li ("Gucci II")*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015), is similarly unavailing.  Opposition at 9-11.  There, Gucci successfully moved to compel a nonparty foreign bank to provide information regarding the defendants' accounts after discovering that the defendants were selling counterfeit Gucci items over the

Internet. *Gucci II*, 135 F. Supp. 3d at 91-92. Olive Group argues that the exercise of personal jurisdiction in *Gucci II* compels the same result here because "British Airways is not a foreign bank with only a correspondent-account foothold in New York; it is a major commercial airline that flies into and out of New York every day, maintains a registered agent and office here, and is being asked only to answer four basic interrogatories about it[s] debts and payments to the judgment debtor." Opposition at 11. But again, the fact that British Airways has more extensive New York contacts than the nonparty bank in *Gucci II* is irrelevant to whether the Subpoena's requests arise from British Airways' New York contacts. With respect to that second prong, Olive Group suggests that *Gucci II* stands for the proposition that courts may compel foreign corporations to comply with discovery when "the discovery is tied to their global commercial operations." Opposition at 11. Yet, in fact, the court in *Gucci II* found that the second prong was satisfied because of the "strong relationship between [the bank's] New York conduct and Gucci's subpoena requests." *Gucci II*, 135 F. Supp. 3d at 94. Indeed, Gucci alleged that the defendants' use of New York bank accounts to perform wire transfers was a "crucial component[] of their counterfeiting operation," and the subpoenas issued sought "information about those very transfers." *Id.* In contrast to *Gucci II*, Olive Group does not assert that British Airways routed payments to the ACAA through New York bank accounts, or that it incurred overflight fees as a result of any flights originating or terminating in New York. So *Gucci II*, too, does not help Olive Group. *See Olive Group*, 2026 WL 1381463, at *3-4 (rejecting Olive Group's reliance on *Gucci II* as "unpersuasive").

Ultimately, notwithstanding Olive Group's suggestion otherwise, the Court cannot exercise specific jurisdiction over British Airways solely because it is "a global commercial airline." Opposition at 9; *see also id.* at 11 ("British [A]irways cannot conduct its global business

without touching the New York financial system."). Under New York law, specific jurisdiction—the only form of personal jurisdiction Olive Group asserts—is limited to claims that arise from British Airways' New York contacts. That British Airways has global operations whose transactions may "run[] through New York correspondent banks and clearinghouses," *id.* at 10, is not enough to satisfy that arise-from standard. Olive Group thus has failed to establish an "articulable nexus" or a "substantial relationship" between British Airways' New York presence and the discovery sought concerning the airline's relationship with the ACAA. *Best Van Lines*, 490 F.3d at 246 (internal quotation marks omitted). Because Olive Group has failed to make this required showing under New York's long-arm statute, the Court does not reach whether exercising personal jurisdiction over British Airways would comport with constitutional principles of due process.

### III.  Federal Rule of Civil Procedure 26(c)

Olive Group also argues that the motion should be denied regardless of the jurisdictional determination because British Airways has not met its burden under Federal Rule of Civil Procedure 26(c). Opposition at 18-20.[4] Rule 26(c)(1) provides that a "court may, for good cause,

---

[4] Olive Group notes that British Airways "did not meet and confer with Olive Group in good faith as required by both Rule 26(c)(1) and [this Court's Individual Rules]." Opposition at 5. Under Rule 26(c)(1), a motion for a protective order "must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." Fed. R. Civ. P. 26(c)(1). Rule 5(c) of the undersigned's Individual Rules and Practices in Civil Cases similarly requires that motions concerning discovery disputes "include a representation that the meet-and-confer process occurred and was unsuccessful." British Airways has not submitted such a certification, nor do the correspondences of the parties provided to the Court reflect that they met and conferred before British Airways filed the instant motion.

While British Airways may not have met the letter of Rule 26(c)(1) or this Court's Individual Rules, the Court declines to strictly enforce a meet-and-confer requirement here. At a minimum, British Airways' response to the Subpoena conveyed a good-faith argument that it cannot be subjected to compelled discovery. *See generally* Response. Plus, the instant dispute

issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Olive Group claims that irrespective of the jurisdictional issue, this rule requires British Airways to "identify specific harms that will result if it is required to answer Olive Group's interrogatories." Opposition at 18. Olive Group further faults British Airways for not addressing "the cost, time, or effort involved in determining whether British Airways owes or has owed money to [the] ACAA, what types of fees those are, or which banks [British Airways] uses to pay them." *Id.*

Olive Group cites no authority for the proposition that a nonparty over which a court lacks personal jurisdiction must make an additional showing of harm to be relieved of complying with a subpoena. Rather, Olive Group analogizes the instant case to a challenge to a Rule 45 subpoena, noting that "the Court may not only grant or deny such a motion, but it may also order the subpoena modified if appropriate." *Id.* at 19 (quoting *Estate of Tillman by Tillman v. City of New York*, 345 F.R.D. 379, 386 (E.D.N.Y. 2024)). Olive Group thus proposes that "[i]f the Court harbors concern about particular categories [of information]," it should tailor discovery by, for example, "limit[ing] the temporal scope" or "enter[ing] a confidentiality order." *Id.* at 19-20.

This argument ignores the role of jurisdiction in discovery disputes. *Tillman*—the case cited by Olive Group—did not involve a jurisdictional question, and the court modified the subpoena by "balancing the *indisputable relevance* of some of the documents present in the

_____

raises primarily a legal question, suggesting that the meet-and-confer process would have been unlikely to clear the parties' logjam. The Court thus relieves British Airways of any meet-and-confer requirement. *See, e.g.*, *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608 (PKC) (JCF), 2013 WL 6283511, at *3 (S.D.N.Y. Dec. 4, 2013) ("[C]ourts have recognized that the merits of a discovery motion may be addressed where the meet-and[-]confer would have been futile." (citation modified)); *Gibbons v. Smith*, No. 01 Civ. 1224 (LAP), 2010 WL 582354, at *2 (S.D.N.Y. Feb. 11, 2010) ("Petitioner's affidavits make clear that any attempt to resolve this dispute informally would have been futile, and as a result, relief from the meet-and-confer requirement is warranted.").

personnel records of the [defendants] with their privacy interests." 345 F.R.D. at 386 (emphasis added). At the same time, however, the court also quashed another subpoena, finding that the "[p]laintiff fail[ed] to demonstrate why [the information sought is] relevant." *Id.* at 385-86. Relevance is not listed among the bases for quashing or modifying subpoenas, *see* Fed. R. Civ. P. 45(d)(3), but that omission does not displace the principle that relevance is a precondition to all discovery, *see* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter *that is relevant*." (emphasis added)). *See SEC v. Leibowitz*, No. 25 Civ. 2155 (JLR), 2025 WL 3763814, at *3 (S.D.N.Y. Dec. 30, 2025) ("The party moving to compel discovery bears the initial burden of demonstrating that the information sought is relevant and proportional." (internal quotation marks omitted)); *see also Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir. 1981) ("Where . . . *the documents are relevant*, the burden is upon the party seeking non-disclosure or a protective order to show good cause." (emphasis added)). Like relevance, personal jurisdiction is a threshold issue which the party seeking discovery must establish before obtaining that discovery. *See Gucci I*, 768 F.3d at 141 ("A district court . . . must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 45."). A court without jurisdiction over the entity from whom discovery is sought lacks the power to limit the scope of disclosures under Rule 45. Similarly, a party cannot require subpoena compliance from a nonparty where jurisdiction over that entity is lacking. *See, e.g.*, *U.S. Cath. Conf. v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) ("The subpoena power of a court cannot be more extensive than its jurisdiction."); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("[T]he district court's power to order discovery to enforce its judgment . . . derive[s] . . . from its power to conduct supplementary

13

proceedings, involving persons indisputably *within its jurisdiction*." (emphasis added)).[5]  The lack of personal jurisdiction over British Airways is determinative.

### IV.  Conclusion

For the above reasons, the Court finds that it lacks personal jurisdiction over British Airways in this matter and therefore grants British Airways' motion for a protective order as to the discovery sought by Olive Group.  British Airways need not respond to Olive Group's subpoena.

SO ORDERED.

Dated: May 26, 2026
      New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[5] Olive Group does not argue that a court may not issue a protective order sought by an entity over which personal jurisdiction is lacking, and a court undoubtedly could deny a motion to compel discovery against an entity over which it lacked personal jurisdiction.  *See Gucci I*, 768 F.3d at 141.  Because "[p]arties seeking cover from discovery may avail themselves of a motion for a protective order which, in effect, is the flip side of a motion to compel," *C.K. ex rel. P.K. v. McDonald*, 345 F.R.D. 262, 268 (E.D.N.Y. 2023), the Court grants the protective order British Airways seeks.  *Cf. Crotts v. Freedom Mortg. Corp.*, No. 4:23-cv-04828, 2025 WL 1871287, at *4 (S.D. Tex. July 8, 2025) (Memorandum, Recommendation, and Order) ("[G]iven the conclusion that personal jurisdiction is lacking, there is good cause to stay discovery under [Rule] 26(c)(1) until the Court determines whether to adopt the recommendation to dismiss all remaining claims.").